## THEODORE FINK *v.* ROBERT B. GOLENBOCK ET AL.
## (15387)
## (15388)

Peters, C. J., and Borden, Norcott, Katz and Palmer, Js.

Argued April 25—officially released July 23, 1996

*Francis G. Pennarola*, for the appellant in Docket No. 15387 (named defendant).

*Mark R. Kravitz*, with whom were *Jeffrey R. Babbin* and, on the brief, *Bernard E. Jacques*, for the appellant in Docket No. 15388 (defendant Joan A. Magner).

*Warren Miller*, with whom, on the brief, was *Ronald E. Lasky*, for the appellee (plaintiff).

KATZ, J. The plaintiff, Theodore Fink, brought this derivative action suit on behalf of a professional corporation known as Theodore Fink, M.D., and Robert B. Golenbock, M.D., P.C. (corporation) against the defendants, Robert B. Golenbock and Joan A. Magner, claiming that they each had wrongfully converted the assets of the corporation, had tortiously interfered with the reasonable business expectancies of the corporation, had been unjustly enriched, and had violated the Connecticut Unfair Trade Practices Act (CUTPA).[1] Additionally, the plaintiff claimed that Golenbock had violated his fiduciary duties to the corporation by misusing funds, assets, property and other benefits rightfully belonging to the corporation. All counts except the CUTPA claims were tried to a jury, which returned a verdict in favor of the plaintiff. The court then rendered judgment in favor of the plaintiff on the CUTPA counts. The defend-

[1] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

ants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We reverse the judgment of the trial court as to Magner; we affirm the judgment of the trial court as to Golenbock.

The jury could reasonably have found the following facts. In 1977, the plaintiff and Golenbock formed the corporation, which became a successful pediatric practice in Bethel. The plaintiff and Golenbock each owned 50 percent of the corporation. At that time, the corporation employed the plaintiff and Golenbock, and, in 1984, it hired Magner.

In June, 1987, the plaintiff's wife brought a dissolution of marriage action against him. Days later, Magner, who had become good friends with the plaintiff's wife, informed the plaintiff that, based upon information she had received from his wife, Magner had filed a report with the department of children and youth services (department),[2] alleging that the plaintiff had engaged in sexual conduct with his young adopted children.[3] Thereafter, Magner and Golenbock informed the plaintiff that, on the basis of these allegations, they could no longer practice medicine with him. On August 1, 1987, the plaintiff left the state for his parents' home in Pennsylvania. When he returned to the practice on August 24, 1987, Magner advised him that she did not believe it was a good idea for him to see patients. Golen-

[2] Effective July 1, 1993, the department of children and youth services was succeeded by the department of children and families. Public Acts 1993, No. 93-91; see General Statutes §§ 17a-1 (c) and 17a-2 (b).

[3] Magner testified that, on the basis of legal advice, she considered that the report was mandated by law. The plaintiff denied all of the allegations of misconduct, claiming them to be "false" and "malicious." He opined that Magner's actions, including filing the report with the department, were part of a deliberate plot to steal his half of the medical practice. According to the plaintiff, Magner, his wife, Golenbock, his former counsel and Magner's counsel were all players in a conspiracy toward this end.

bock informed the plaintiff that he would not be allowed to see patients and that the plaintiff was no longer part of the medical practice. Golenbock further informed the plaintiff that if he tried to return to the practice, Golenbock would have the plaintiff arrested and have his license taken away, whereupon the plaintiff returned to Pennsylvania, where he remained for four years. In August, 1987, the plaintiff and Golenbock had held preliminary discussions to consider the dissolution of the corporation, but were unable to reach an agreement to dissolve.

In October, 1987, Golenbock and Magner incorporated Stony Hill Pediatrics, P.C. (Stony Hill), a professional corporation operating a pediatric medical practice.[4] Stony Hill occupied the building owned by the corporation, used the same telephone number as that of the corporation, and used the equipment that belonged to the corporation. Furthermore, Golenbock took $10,000 from the corporation's checking account to establish Stony Hill. Additionally, the defendants did not pay the corporation either for the use of its equipment or for the use of its building. Finally, patients formerly treated by the corporation were told to make their payments for that treatment to Stony Hill.

In September, 1988, the plaintiff telephoned Golenbock in an attempt to return to the practice, but Golenbock rebuffed his approach. Golenbock again informed the plaintiff that if the plaintiff attempted to return to the practice, he would have him arrested.

On the basis of these facts, the jury found that both defendants had wrongfully misappropriated and converted the business assets of the corporation, had tortiously interfered with the reasonable business expectancies of the corporation, had been unjustly

---

[1] Stony Hill had initially been named as a defendant and was only dropped as a defendant after jury selection had begun.

enriched, and that Golenbock had violated his fiduciary duties.[5] The court then ruled in favor of the plaintiff on the CUTPA counts.[6] Additional facts will be provided as needed.

## I

Magner asserts six claims on appeal, namely that: (1) the trial court improperly awarded punitive damages against her; (2) there was insufficient evidence to sup-

[5] In its answers to interrogatories provided by the trial court, the jury found that Golenbock and Magner were each liable for $655,000 for conversion, $630,000 for tortious interference and $43,500 for unjust enrichment, and that Golenbock was separately liable for $120,000 for breach of his fiduciary duties. The jury also answered "yes" to the question of whether the court should award punitive damages. On its verdict form, the jury awarded the plaintiff damages of $2,777,000, reflecting the sum of all the amounts listed in the interrogatories. The court assessed punitive damages on the conversion count in the amount of $750,000.

Thereafter, the defendants moved for a remittitur to reduce the judgment, which the trial court granted. Magner requested a remittitur because the verdict reflected that the jury improperly had added together the damages for each count of the complaint despite the fact that each count sought the identical compensatory damages. Additionally, Magner argued that the jury improperly had doubled the plaintiff's damages for the counts asserted against both defendants and improperly had included the damages for which Golenbock alone had been found liable. Magner argued that the judgment against her should have been reduced to a maximum of $655,000, exclusive of the punitive damages assessed by the court, which amount represented the largest damage award assessed against her by the jury. Golenbock's request for a remittitur raised many of the same claims.

The trial court found that the only evidence of the plaintiff's loss was the fair market valuation of the corporation by the plaintiff's expert in the amount of $194,000 in tangible assets and $415,000 in good will, for a total amount of $609,000. Accordingly, it held that the plaintiff's maximum recovery was $609,000, plus legal interest from August 15, 1987 to March 15, 1995, of $686,963, and punitive damages of attorney's fees of $617,000, reflecting an adjustment for the reduced recovery. The court therefore ordered a remittitur of $1,614,037, and stated that if it were accepted, the plaintiff would be entitled to joint and several recovery from Golenbock and Magner in the amount of $1,912,963, plus costs.

[6] On the CUTPA claim, the court awarded the plaintiff $700,000 in compensatory damages and $200,000 in attorney's fees, but found that those amounts had already been included in the jury's verdict and award of punitive damages and therefore that the judgment would not be augmented by those amounts.

port a judgment finding her liable for conversion, interference with business expectancies and unjust enrichment; (3) the trial court improperly rendered judgment in favor of the plaintiff on the CUTPA claims; (4) the trial court improperly limited her testimony concerning the circumstances of her report of the plaintiff's alleged sexual misconduct; (5) the trial court improperly awarded prejudgment interest; and (6) the trial court improperly awarded judgment in favor of the plaintiff because all of the plaintiff's claims are barred by res judicata. Because we agree with Magner that all the plaintiff's claims were or could have been previously adjudicated in an arbitration proceeding, we conclude that the claims are barred by res judicata.

The following additional facts are relevant to the resolution of Magner's res judicata claim. Magner was hired by the corporation in December, 1984. In September, 1986, Magner entered into a new employment contract with the corporation. This contract contained a clause that prohibited Magner from competing with the corporation in a medical practice for a specified period of time. The contract also contained an arbitration clause that provided that "[a]ny disputes arising under this Agreement (except if Corporation seeks injunctive relief as herein provided) shall be submitted to the American Arbitration Association in Hartford, Connecticut." In October, 1988, the plaintiff submitted a demand for arbitration claiming that Magner had breached her employment contract and the covenant not to compete. The plaintiff's demand for arbitration stated that "[c]laimant entered into an Employment Agreement with respondent . . . . Respondent unilaterally and wrongfully terminated her employment with claimant. Respondent also breached her agreement not to compete by engaging in the practice and business of medicine and doing other contractually prohibited acts

within a geographic area and time frame as agreed in her employment agreement." After an arbitration hearing held on April 6, 1989, the panel of arbitrators issued an award denying the plaintiff's claims.[7]

Thereafter, the plaintiff continued to trial with various claims against Magner, including tortious interference with business expectancies, conversion, unjust enrichment, and violation of CUTPA. Before trial, Magner moved for summary judgment, claiming that all of the plaintiff's claims were barred by res judicata. The trial court never formally ruled on this motion. Subsequently, Magner filed a motion in limine to preclude the introduction of evidence relating to the claims previously adjudicated at the arbitration, which motion was denied. Following the trial, at which the plaintiff had prevailed on all counts, Magner filed a motion to set aside the verdict and requested that judgment be rendered in her favor, which motion was similarly denied.

Magner argues on appeal that the plaintiff's claims are barred by res judicata because these claims were

---

[7] The "award of arbitrators" provides: "WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and dated September 1986, and having duly sworn and having duly heard the proofs and allegations of the parties, AWARD as follows:

"The claim of Theodore Fink, M.D. & Robert B. Golenbock, M.D., P.C., hereinafter referred to as Claimants against Joan Ann Magner, M.D., hereinafter referred to as Respondent is denied.

"The administrative fees and expenses of the American Arbitration Association totaling $2,480.10 shall be borne by Claimants.

"Therefore, Claimants shall pay to Respondent the sum of $150.00 for that portion of its share of administrative fees and expenses previously advanced by Respondent to the Association. Claimants shall pay to the American Arbitration Association the sum of $65.00 for that portion of its share of administrative fees and expenses still due the Association.

"The compensation of the Arbitrators totaling $3,000.00 shall be borne by Claimants. Therefore, Claimants shall pay to the Respondent the sum of $1,500.00 for compensation previously advanced by Respondent to the Association.

or could have been adjudicated in the arbitration proceeding. We agree.

" '[T]he doctrine of res judicata, or claim preclusion, [provides that] a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action [between the same parties or those in privity with them] on the same claim. A judgment is final not only as to every matter which was offered to sustain the claim, but also as to *any other admissible matter which might have been offered for that purpose. Cromwell* v. *County of Sac*, 94 U.S. 351, 352–53, 24 L. Ed. 195 (1876); 1 Restatement (Second), [Judgments] §§ 19, 25; James & Hazard, Civil Procedure (2d Ed.) § 11.3.' *State* v. *Aillon*, 189 Conn. 416, 423–24, 456 A.2d 279, cert. denied, 464 U.S. 837, 104 S. Ct. 124, 78 L. Ed. 2d 122 (1983). The rule of claim preclusion prevents reassertion of the same claim regardless of what additional or different evidence or legal theories might be advanced in support of it.

" 'We have adopted a transactional test as a guide to determining whether an action involves the same claim as an earlier action so as to trigger operation of the doctrine of res judicata. [T]he claim [that is] extinguished [by the judgment in the first action] includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. What factual grouping constitutes a "transaction," and what groupings constitute a "series," are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business under-

---

"This Award is in full and final settlement of any and all claims submitted to this Arbitration."

standing or usage. . . . *Orselet* v. *DeMatteo*, [206 Conn. 542, 545–46, 539 A.2d 95 (1988)]; see *Duhaime* v. *American Reserve Life Ins. Co.*, 200 Conn. 360, 364–65, 511 A.2d 333 (1986); see also *Nevada* v. *United States*, 463 U.S. 110, 130–31 n.12, 103 S. Ct. 2906, 77 L. Ed. 2d 509 (1983); 1 Restatement (Second), [supra, § 24]. In applying the transactional test, we compare the complaint in the second action with the pleadings and the judgment in the earlier action. See, e.g., *Nevada* v. *United States*, supra, 131–34; *Capraro* v. *Tilcon Gammino, Inc.*, 751 F.2d 56, 57 (1st Cir. 1985).' . . . *Commissioner of Environmental Protection* v. *Connecticut Building Wrecking Co.*, 227 Conn. 175, 189–90, 629 A.2d 1116 (1993). . . .

"Finally, we recognize that a decision whether to apply the doctrine of res judicata to claims that have not actually been litigated should be made based upon a consideration of the doctrine's underlying policies, namely, the interests of the defendant and of the courts in bringing litigation to a close; 1 Restatement (Second), supra, § 24, p. 199; and the competing interest of the plaintiff in the vindication of a just claim. We have stated that res judicata 'should be applied as necessary to promote its underlying purposes. These purposes are generally identified as being (1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation. . . . The judicial [doctrine] of res judicata . . . [is] based on the public policy that a party should not be able to relitigate a matter which it already has had an opportunity to litigate. . . . Stability in judgments grants to parties and others the certainty in the management of their affairs which results when a controversy is finally laid to rest. . . . We review the doctrine of res judicata to emphasize that its purposes must

inform the decision to foreclose future litigation. The conservation of judicial resources is of paramount importance as our trial dockets are deluged with new cases daily. We further emphasize that where a party has fully and fairly litigated his claims, he may be barred from future actions on matters not raised in the prior proceeding. But the scope of matters precluded necessarily depends on what has occurred in the former adjudication.' . . . *State* v. *Ellis*, [197 Conn. 436, 465–67, 497 A.2d 974 (1985)]." (Emphasis added.) *Delahunty* v. *Massachusetts Mutual Life Ins. Co.*, 236 Conn. 582, 589–92, 674 A.2d 1290 (1996).

Magner argues that, for purposes of res judicata, the claims that the plaintiff asserts in this action are the same as the claims that he asserted or could have asserted before the arbitration panel. Before the panel, he claimed that Magner had breached her employment contract and that she had breached the covenant not to compete contained in her employment contract. Magner argues that the additional claims raised in this action, namely, tort claims of conversion, unjust enrichment and tortious interference with business expectancies, and a claim for a violation of CUTPA, are simply alternate theories of recovery for the same underlying conduct that formed the basis of the arbitration. Furthermore, Magner claims that the plaintiff could have raised these issues at arbitration because the submission offered by the parties was broad and unrestricted. The plaintiff argues in response that the submission for arbitration covered only those issues arising out of the employment contract, which referred only to claims of a breach of a contract and breach of a covenant not to compete. We agree with Magner.

In order to determine whether res judicata bars the plaintiff's claims, we must consider the nature of arbitrations and, in specific, what issues were or could have been raised at the arbitration proceeding between the

plaintiff and Magner. "This court has for many years wholeheartedly endorsed arbitration as an effective alternative method of settling disputes intended to avoid the formalities, delay, expense and vexation of ordinary litigation." (Internal quotation marks omitted.) *O & G/O'Connell Joint Venture* v. *Chase Family Ltd. Partnership No. 3*, 203 Conn. 133, 145, 523 A.2d 1271 (1987); see *John A. Errichetti Associates* v. *Boutin*, 183 Conn. 481, 488, 439 A.2d 416 (1981) (arbitration is favored by law); 4 Am. Jur. 2d, Alternative Dispute Resolution § 8 (1995).

" 'Arbitration is the voluntary submission,[8] by the interested parties, of an existing or future dispute to a disinterested person or persons for final determination.' *Gores* v. *Rosenthal*, 150 Conn. 554, 557, 192 A.2d 210 [1963]." *Gary Excavating, Inc.* v. *North Haven*, 164 Conn. 119, 121, 318 A.2d 84 (1972); see 4 Am. Jur. 2d, [supra, § 85]. The "authority for arbitration must be derived from the agreement of the parties; *Gary Excavating, Inc.* v. *North Haven*, [supra, 122]; *Gores* v. *Rosenthal*, [supra, 557]; *Connecticut Union of Telephone Workers, Inc.* v. *Southern New England Telephone Co.*, 148 Conn. 192, 197, 169 A.2d 646 (1961); *Amalgamated Assn.* v. *Connecticut Co.*, 142 Conn. 186, 191, 112 A.2d 501 (1955); and the relevant provisions of applicable statutory directives;[9] cf. *Oliva* v. *Aetna Casualty & Surety Co.*, 181 Conn. 37, 434 A.2d 304 (1980)." *W. J. Megin, Inc.* v. *State*, 181 Conn. 47, 49–51, 434 A.2d 306 (1980).

"Legal as well as factual disputes may be designated by the contract to be within the purview of the arbitrators; *Connecticut Union of Telephone Workers, Inc.* v. *Southern New England Telephone Co.*, [supra, 148

---

[8] We recognize that certain arbitration is mandated by statute; see, e.g., General Statutes §§ 7-473c and 10-153f (c) (1); however, these statutes have no applicability here.

[9] See General Statutes § 52-408 et seq.

Conn. 197]; *Colt's Industrial Union* v. *Colt's Mfg. Co.*, 137 Conn. 305, 307, 77 A.2d 301 [1950]; but arbitration and its scope remain dependent on the contract. The courts are empowered to direct compliance with the provisions of arbitration agreements, but no one may be compelled to arbitrate a dispute outside the scope of the agreement, which constitutes the charter of the entire arbitration proceeding and defines and limits the issues to be decided by the arbitrators. *Gores* v. *Rosenthal,* [supra, 150 Conn. 557]; *Amalgamated Assn.* v. *Connecticut Co.*, [supra, 142 Conn. 191]." *Gary Excavating, Inc.* v. *North Haven,* supra, 164 Conn. 121–22; see *Connecticut Union of Telephone Workers, Inc.* v. *Southern New England Telephone Co.*, supra, 197; *Local 63, Textile Workers Union* v. *Cheney Bros.,* 141 Conn. 606, 613, 109 A.2d 240 (1954), cert. denied, 348 U.S. 959, 75 S. Ct. 449, 99 L. Ed. 2d 748 (1955). Furthermore, this court has determined that doubts regarding whether an issue is arbitrable should be resolved in favor of arbitration. See *John A. Errichetti Associates* v. *Boutin,* supra, 183 Conn. 488–89 ("Under the positive assurance test, judicial inquiry . . . must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance. . . . An order to arbitrate the particular grievance should not be denied unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." [Emphasis in original; internal quotation marks omitted.]).

This court has previously concluded that the doctrine of res judicata applies to the decisions of an arbitration panel, especially in a case in which the decisions are made for a purpose similar to those of a court and in proceedings similar to judicial proceedings. See *Corey* v. *Avco-Lycoming Division,* 163 Conn. 309, 317–18, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116, 93 S. Ct.

903, 34 L. Ed. 2d 699 (1973). "No satisfactory reason can be assigned why an award, which the parties have expressly stipulated should be final as to the subject submitted, should not be as conclusive as a court-rendered judgment. 2 Freeman, Judgments (5th Ed.) § 636. . . . 'The award . . . valid on its face . . . has the force of a judgment, and therefore becomes *res judicata* as to all matters embraced in the submission . . . between the parties.' *Campbell* v. *Campbell*, 45 App. D.C. 142, 154A, cert. denied, 242 U.S. 642, 37 S. Ct. 114, 61 L. Ed. 542 [1916]. 'An arbitration award is accorded the benefits of the doctrine of res judicata in much the same manner as the judgment of a court.' 6 C.J.S., Arbitration and Award, § 97." (Emphasis in original.) *Corey* v. *Avco-Lycoming Division*, supra, 318–19; see 2 Restatement (Second), supra, § 84.

Our examination of the claims that were actually decided in the arbitration proceeding and those that could have been decided because they were within the scope of the submission persuades us that the claims asserted in the present action are barred by res judicata. In this case, the parties agreed that "[a]*ny disputes* arising under [the employment agreement between Magner and the plaintiff] shall be submitted to the American Arbitration Association . . . ." (Emphasis added.) This court has previously described similar language as all-embracing, all-encompassing and broad. See *Gary Excavating, Inc.* v. *North Haven*, supra, 164 Conn. 123 (words "any disagreement" are broad and all-embracing); *Connecticut Union of Telephone Workers, Inc.* v. *Southern New England Telephone Co.*, supra, 148 Conn. 197 (words "all claims" described as all-encompassing).

The tort claims and the claim for a violation of CUTPA that the plaintiff litigated in this action could have been brought in the arbitration proceeding.[10] These types of

[10] The parties dispute, in their supplemental briefs, whether CUTPA claims are arbitrable. Because we conclude that their submission to arbitration

actions are encompassed within the broad and unrestricted submission agreed to by the parties. The predicate for these claims is a dispute arising under the employment agreement between Magner and the plaintiff because it is this agreement that establishes the employment relationship from which the underlying conduct that forms the basis of the dispute stems. At the arbitration hearing, evidence was presented to indicate that Stony Hill used the same office, equipment, employees, patients and telephone number that the corporation had used, and that Stony Hill had placed advertisements in newspapers and had sent notices to patients that Stony Hill would be taking over the corporation's business. This is the same evidence that the plaintiff relied on at trial in establishing violations of the tort claims and CUTPA. Because the factual underpinnings of these claims and those that were actually arbitrated are the same, we are persuaded that the transactional test is satisfied. *Orselet* v. *DeMatteo*, supra, 206 Conn. 545–46. The plaintiff had the opportunity to present and litigate fully these issues before the arbitration panel, but failed to do so. It would be a waste of judicial resources to permit litigation of these issues now. Given our strong commitment to the arbitration of disputes, especially when the parties have voluntarily agreed to arbitration, and in light of the broad language in the submission of the parties in this case, we conclude that the plaintiff could have litigated all the issues presently before us in the arbitration proceeding. Accordingly, these issues are barred by res judicata and the judgment against Magner must be set aside and a judgment must be rendered in her favor.

was broad and because we have been presented with no public policy reason to preclude the arbitration of CUTPA claims, the plaintiff's claim for a violation of CUTPA in this case could have been submitted to arbitration. See, e.g., *Herbert S. Newman & Partners* v. *CFC Construction Ltd. Partnership*, 236 Conn. 750, 759–60, 674 A.2d 1313 (1996) (court will enforce contract as drafted absent showing of unconscionability, mistake, fraud, or other countervailing policy reason).

## II

Golenbock raises four claims on appeal, only one of which overlaps with the claims raised by Magner.[11] He argues that: (1) a derivative action by the plaintiff on behalf of the corporation was inappropriate, because the claimed injuries could only have been the subject of an action by the plaintiff personally, and the plaintiff did not fairly and adequately represent the interests of the shareholders as required by General Statutes § 52-572j; (2) the trial court improperly denied his motion to set aside the verdict and his motion for judgment notwithstanding the verdict because the court failed to recognize that the evidence produced by the plaintiff had established only that Stony Hill, and not the defendants, had taken the business and assets of the corporation; (3) the trial court improperly admitted into evidence a hearsay statement regarding the alleged economic losses suffered by the corporation; and (4) the trial court improperly rendered judgment in favor of the plaintiff on the CUTPA claim. We are not persuaded by these claims.

### A

Golenbock's first claim is that the trial court improperly allowed the plaintiff to sue on behalf of the corporation because the plaintiff's injuries were personal and not derivative in nature and because the plaintiff did not fairly and adequately represent the interests of the other shareholders.[12] We conclude that the plaintiff's derivative action was proper.

Before we turn to the merits of this claim, however, we must first address the plaintiff's claim that Golenbock is barred from raising this issue because he failed

---

[11] Both Golenbock and Magner claim that the trial court improperly found CUTPA violations.

[12] Golenbock was the only other shareholder, owning 50 percent of the corporation.

to plead the plaintiff's lack of representative capacity as a special defense, and therefore cannot raise it for the first time on appeal. We are unpersuaded by the plaintiff's procedural claim.

Because representative capacity is a question of standing, it must be addressed by the court whenever raised. The plaintiff has the burden of proving standing. *Sadloski* v. *Manchester*, 235 Conn. 637, 648–49, 668 A.2d 1314 (1995).[13]

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action . . . ." (Internal quotation marks omitted.) *Ardmare Construction Co.* v. *Freedman*, 191 Conn. 497, 501, 467 A.2d 674 (1983). " '[O]nce the question of lack of [standing] is raised, [it] must be disposed of no matter in what form it is presented . . . . [A] court must have jurisdiction to determine its own jurisdiction once that has been put in issue.' " *Golden Hill Paugussett Tribe of Indians* v. *Southbury*, 231 Conn. 563, 570–71, 651 A.2d 1246 (1995), quoting *Castro* v. *Viera*, 207 Conn. 420, 429–30, 541 A.2d 1216 (1988). Thus, even though Golenbock did not raise the issue of the plaintiff's standing to sue in a representative capacity in a timely manner, we are required to address it before proceeding further.

1

Golenbock first argues that the plaintiff did not have standing to sue on behalf of the corporation because

[13] At trial, the plaintiff took exception to the trial court's charge to the jury that the plaintiff bore the burden of proving his right to sue in a derivative capacity. The plaintiff claimed that he only bore this burden if one of the defendants had raised lack of standing as a special defense. We disagree. The plaintiff bears the burden of proving subject matter jurisdiction, whenever and however raised. *Sadloski* v. *Manchester*, supra, 235 Conn. 648–49. It is highly preferable that such issues be raised in a timely manner, as set out in Practice Book § 160 and Practice Book Form 105.4.

the plaintiff's injuries were personal and not derivative. We disagree to the extent that Golenbock claims that a derivative action was improper; we need not decide whether the plaintiff could properly have brought a direct suit had he so chosen.[14]

"Since at least the middle of the 19th century, it has been accepted in this country that the law should permit shareholders to sue derivatively on their corporation's behalf under appropriate conditions." 2 American Law Institute, Principles of Corporate Governance: Analysis and Recommendations (1994) c. 1, p. 4, introductory note. "[I]t is axiomatic that a claim of injury, the basis of which is a wrong to the corporation, must be brought in a derivative suit, with the plaintiff proceeding 'secondarily,' deriving his rights from the corporation which is alleged to have been wronged." *Yanow* v. *Teal Industries, Inc.*, 178 Conn. 262, 281, 422 A.2d 311 (1979).

Derivative actions are governed by § 52-572j.[15] Under § 52-572j, a shareholder who believes that the corporation has been harmed by the actions of corporate officers, directors, or third parties may bring suit on behalf

---

[14] At least one authority has suggested that in the case of a closely held corporation, the court may choose to treat a derivative action as a direct action: "In the case of a closely held corporation . . . the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery . . . ." 2 American Law Institute, Principles of Corporate Governance: Analysis and Recommendations (1994) § 7.01 (d).

[15] General Statutes § 52-572j provides in pertinent part: "Derivative actions by shareholders or members. (a) Whenever any corporation or any unincorporated association fails to enforce a right which may properly be asserted by it, a derivative action may be brought by one or more shareholders or members to enforce the right, provided the shareholder or member was a shareholder or member at the time of the transaction of which he complained or his membership thereafter devolved on him by operation of law. . . . The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. . . ."

of the corporation, should the corporation fail to do so itself. In contrast, in order for a shareholder to bring a direct or personal action against the corporation or other shareholders, that shareholder must show an injury that is separate and distinct from that suffered by any other shareholder or by the corporation. *Yanow* v. *Teal Industries, Inc.*, supra, 178 Conn. 282; see also *In re Ionosphere Clubs, Inc.*, 17 F.3d 600, 605 (2d Cir. 1994) ("[t]he distinction between derivative and direct claims turns primarily on whether the breach of duty is to the corporation or to the shareholder[s] and whether it is the corporation or the shareholder[s] that should appropriately receive relief").

As a director of the corporation, Golenbock was required to perform his duties in good faith, in a manner he reasonably believed to be in the best interests of the corporation and with such care as would be exercised by an ordinarily prudent person in a like position under similar circumstances. General Statutes § 33-313 (d).[16] When Golenbock allegedly prevented the plaintiff from participating in the business of the corporation, used corporation assets to establish a new corporation, lost corporate funds in speculative investments and falsely informed corporation clients that the corporation no

---

[16] General Statutes § 33-313 (d) provides in pertinent part: "A director shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care as an ordinarily prudent person in a like position would use under similar circumstances."

The fact that the corporation was a professional service corporation is of no import to this case. Under General Statutes § 33-182i, which provides in pertinent part that "[the stock corporation act] is applicable to a corporation organized pursuant to this chapter except to the extent that any of the provisions of this chapter are interpreted to be in conflict with the provisions of said [act], in which event the provisions of this chapter shall take precedence with respect to a corporation organized pursuant to the provisions of this chapter," the directors of professional service corporations are subject to the duties set forth in § 33-313.

longer existed, he violated the statutory duty of care he owed to the corporation. Therefore, a derivative suit on behalf of the corporation was appropriate.

Golenbock argues, however, that because the corporation was a closely held professional corporation in which the plaintiff and Golenbock were the only shareholders, each holding 50 percent of the outstanding stock, any injury claimed by the plaintiff to have been caused by Golenbock would necessarily be an individual injury and not an injury to the corporation. We disagree. If we were to accept this argument, shareholders of a closely held corporation would rarely, if ever, be able to sue on behalf of the corporation when the other shareholders acted in a manner detrimental to the corporation. Because we believe that result to be undesirable, we reject Golenbock's argument.[17] Rather, we recognize that there may be some instances in which the facts of a case give rise either to a direct action or to a derivative action—such as when an act affects both the relationship of the particular shareholder to the corporation and the structure of the corporation itself, causing or threatening injury to the corporation. 2 American Law Institute, supra, § 7.01, comment (c); see also J. Welch, "Shareholder Individual and Derivative Actions: Underlying Rationales and the Closely Held Corporation," 7 J. Corp. L. 147, 156 (1984) ("[T]he injury criterion can be most misleading in cases involving closely held corporations. If followed literally, this criterion would convert almost all actions by the sharehold-

[17] Golenbock cites as support the case of *LoSacco* v. *Parmalee,* Superior Court, judicial district of Middlesex, Docket No. 46423 (November 24, 1986), in which the trial court denied the defendant's motion to dismiss for lack of standing, finding that one of two 50 percent shareholders had an individual claim against the other. Although that decision is not binding on this court, we note that nothing in that trial court's decision suggests that the plaintiff could not have brought a derivative action instead. The fact that in that case the plaintiff chose not to sue derivatively does not support Golenbock's claim that personal and derivative actions are invariably mutually exclusive.

ers of closely held corporations into individual actions, since the impact of almost any injury to such corporations will fall heavily upon its shareholders."). In this case, the plaintiff did not bring a personal action, and we need not determine whether he could have done so. As we stated previously, the derivative action was appropriate.

Golenbock further claims that because the plaintiff "abandoned" the practice of the corporation, the corporation ceased to exist, making a derivative claim impossible. Relying on *Yanow* v. *Teal Industries, Inc.*, supra, 178 Conn. 262, Golenbock argues that, upon the plaintiff's departure from the medical practice, the corporation had ceased to exist, and that, consequently, the plaintiff could not claim that the corporation had been injured by Golenbock's subsequent actions. Although we agree that a shareholder cannot bring a derivative action on behalf of a corporation which has ceased to exist; id., 286; those are not the facts here.

Pursuant to General Statutes § 33-291 (c),[18] a corporation, once formed, exists until it is dissolved in accordance with the provisions of the Stock Corporation Act; General Statutes § 33-282 et seq.;[19] until it is extinguished through a valid merger pursuant to General Statutes § 33-369,[20] or, if it is of limited duration, until

[18] General Statutes § 33-291 (c) provides: "Subject to the dissolution provisions of this chapter, a corporation shall have perpetual succession by its corporate name unless a limited period of duration is stated in its certificate of incorporation."

[19] Dissolution and winding up of corporations is covered by General Statutes §§ 33-375 through 33-388. The methods of dissolution include dissolution by resolution, by expiration of a period of duration set forth in the articles of incorporation, by judicial proceeding, or by forfeiture as effected by the secretary of state.

[20] General Statutes § 33-369 provides in pertinent part: "Effect of merger or consolidation. Upon the effectiveness of a merger or consolidation:

"(a) The merging corporations or consolidating corporations party to the plan of merger or consolidation shall be a single corporation, which, in the case of a merger, shall be that corporation designated in the plan of merger

a date set forth in its articles of incorporation. There is no indication in the record before us that the corporation in this case was of limited duration or that the parties took any legal steps to dissolve or extinguish the corporation. Therefore, the corporation continued to exist after the plaintiff left the medical practice run by the corporation.

2

Golenbock next claims that the plaintiff was not entitled to sue on behalf of the corporation because he could not fairly and adequately represent the interests of the other shareholders as required by § 52-572j (a).[21] The statute requires fair and adequate representation in order to avoid possible antagonism between the interests of the representative and those of the class, antagonism which may lead to conflicts such that the interests of the other stockholders are disregarded in the management of the case. *Barrett* v. *Southern Connecticut Gas Co.*, 172 Conn. 362, 374, 374 A.2d 1051 (1977).[22]

In *Barrett*, this court determined that the nominal plaintiff could not fairly and adequately represent the other shareholders. Because the plaintiff had brought an individual action against the corporation prior to bringing the derivative action, he, therefore, was seeking to "act on behalf of [the corporation] and all its shareholders at the same time he [was] demanding of them, as damages, funds which the corporation might

as the surviving corporation and, in the case of a consolidation, shall be the new corporation provided for in the plan of consolidation.

"(b) The separate existence of all merging or consolidating corporations parties to the plan of merger or consolidation, except the surviving or new corporation, shall cease."

[21] See footnote 15.

[22] Indeed, because of the potential res judicata effect of a derivative suit, it is proper for the defendants in such an action to attack the standing of the plaintiff on the ground that the plaintiff cannot fairly and adequately represent similarly situated shareholders. *Barrett* v. *Southern Connecticut Gas Co.*, supra, 172 Conn. 371–74.

otherwise use for dividends." Id. *Barrett,* however, does not hold that a plaintiff with possible individual claims against the corporation can *never* fairly and adequately represent other shareholders in a derivative action. Whether a plaintiff is an appropriate representative is fact-specific and depends upon any number of factors.

In a case interpreting rule 23.1 of the Federal Rules of Civil Procedure,[23] which parallels § 52-572j, the United States Court of Appeals for the Ninth Circuit stated that other factors the court may consider include: (1) whether the named plaintiff is the real party in interest; (2) the plaintiff's familiarity with the litigation and willingness to learn about the suit; (3) the degree of control exercised by attorneys over the litigation; (4) the degree of support given to the plaintiff by the other shareholders; (5) the plaintiff's personal commitment to the action; (6) the remedies sought by the plaintiff; (7) the relative magnitude of the plaintiff's personal interests as compared to the plaintiff's interest in the derivative action itself; and (8) the plaintiff's vindictiveness toward the other shareholders. *Larson* v. *Dumke,* 900 F.2d 1363, 1367 (9th Cir.), cert. denied, 498 U.S. 1012, 111 S. Ct. 580, 112 L. Ed. 2d 585 (1990). Other courts have also adopted such a multifactor analysis. See *Rothenberg* v. *Security Management Co.,* 667 F.2d 958, 961 (11th Cir. 1982); *Davis* v. *Comed, Inc.,* 619 F.2d 588, 593–94 (6th Cir. 1980); *Newell Co.* v. *Vermont American Corp.,* 725 F. Sup. 351, 368–69 (N.D. Ill. 1989); *In re Dayco Corp. Derivative Securities Litigation,* 102 F.R.D. 624, 632 (S.D. Ohio 1984).

We choose to adopt this approach as well. We note that the above factors are nonexclusive and interre-

[23] Rule 23.1 of the Federal Rules of Civil Procedure provides in pertinent part: "The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association."

lated, and that it is frequently a combination of factors that guides a court in determining whether a plaintiff meets the requirements of fair and adequate representation. *Larson* v. *Dumke,* supra, 900 F.2d 1367, citing *Davis* v. *Comed, Inc.,* supra, 619 F.2d 593–94. Not all factors will come into play in all cases, and in some cases there may be additional factors for the court to consider. The key is whether "the nominal plaintiff's . . . interests and issues [are] coextensive with those of the class of shareholders he seeks to represent," and whether he is "able to assure the trial court that as a representative, he will 'put up a real fight.' " *Barrett* v. *Southern Connecticut Gas Co.,* supra, 172 Conn. 373.

In this case, Golenbock challenges the plaintiff's ability to represent fairly and adequately the interests of other shareholders because he, as the sole remaining shareholder, does not share the same interests as the plaintiff. Golenbock does not challenge, however, the plaintiff's familiarity with the issues, personal commitment and interest in the outcome, or control over the litigation. Furthermore, as we have already stated, whether the plaintiff may have personal claims is not relevant here, because those personal claims were not brought and therefore, unlike *Barrett,* do not affect the derivative action. Additionally, although it does appear from the facts that there is a great deal of personal animosity between the plaintiff and the defendants, that animosity springs directly from the actions of the defendants against the corporation.

Under the facts of this case, and in light of the plaintiff's special status as one of only two shareholders, we conclude that he is a fair and adequate representative of the corporation. The rule is not that the plaintiff must fairly and adequately represent the interests of all other shareholders; rather, under § 52-572j, the plaintiff must answer to those shareholders who are *similarly situated.* In a case such as this, where there is only one other

shareholder in the corporation and it is that shareholder who is allegedly responsible for the harm to the corporation, there is no other similarly situated shareholder and the plaintiff should not be prevented from bringing an otherwise proper derivative action by an objection from the wrongdoing shareholder. See *Larson* v. *Dumke*, supra, 900 F.2d 1367 (single shareholder allowed to bring derivative suit when it was clear that all other shareholders had benefited from wrong claimed in suit). Thus, the derivative action is appropriate, not because the plaintiff is representative of the opposing shareholders, but because the corporation has interests that need to be represented, and the plaintiff shareholder may be the only representative in a position to protect those interests. J. Welch, supra, 7 J. Corp. L. 194.

B

Golenbock's second claim is that the trial court improperly denied his motion for a directed verdict and his subsequent motion for judgment notwithstanding the verdict because, according to Golenbock, the plaintiff's evidence implicated only Stony Hill, which had been dropped as a defendant at the beginning of the trial, and not the individual defendants. In effect, Golenbock claims that there was insufficient evidence for the jury to find that he had converted corporate assets, had tortiously interfered with the corporation's reasonable business expectancies, was unjustly enriched and had breached his fiduciary duty to the corporation. We disagree.

Our review of a trial court's decision denying a motion for a directed verdict, or refusing to set aside a verdict, " 'requires us to consider the evidence in the light most favorable to the prevailing party, according particular weight to the congruence of the judgment of the trial judge and the jury, who saw the witnesses and heard

their testimony . . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion.' " *Stewart* v. *Federated Dept. Stores, Inc.*, 234 Conn. 597, 610, 662 A.2d 753 (1995), quoting *Mather* v. *Griffin Hospital*, 207 Conn. 125, 130, 540 A.2d 666 (1988). "A jury verdict should not be disturbed unless it is against [the weight of the] evidence or its manifest injustice is so plain as to justify the belief that the jury or some of its members were influenced by ignorance, prejudice, corruption or partiality. . . . [T]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable." (Citations omitted; internal quotation marks omitted.) *Kalleher* v. *Orr*, 183 Conn. 125, 126–27, 438 A.2d 843 (1981).

The jury heard evidence that Golenbock had conspired with Magner to drive the plaintiff out of the medical practice that they shared under the aegis of the corporation;[24] that Golenbock had threatened the plaintiff and prevented him from returning to the practice; that Golenbock had notified present and former patients that the plaintiff was no longer part of the practice; that Golenbock had notified present and former patients that the corporation no longer existed; that Golenbock had instructed present and former patients to make all payments owed to the corporation to Stony Hill; that Golenbock had used assets and equipment belonging to the corporation, including $10,000 from the corporation's checking account, to establish Stony Hill while still a shareholder and director of the corporation; and that Golenbock had used the corporation's money to purchase a new car for personal use.

---

[24] In her appeal to this court, Magner also raised claims as to the sufficiency of the evidence against her. Because we have found that Magner's case is resolved through res judicata, we do not reach her claim of evidentiary insufficiency. The following discussion applies only to the facts as they relate to Golenbock.

Golenbock denied conspiring to drive the plaintiff out of the practice, but he did admit to using corporation assets to start Stony Hill.[25] Golenbock further testified to losing $120,000 of the corporation's money in speculative investments.[26] In his defense, Golenbock testified that he believed that the corporation had been dissolved. Golenbock further claimed that the plaintiff had misused corporation funds, and that was one of the reasons Golenbock wished to terminate their relationship.

[25] Under cross-examination by the plaintiff's attorney, Golenbock acknowledged using the corporation's money to establish Stony Hill:

"Q: Where did you get the money to start Stony Hill Pediatrics, i.e., that $10,000?

"A: My recollection is that I wrote a check from the main checkbook of Fink and Golenbock."

[26] On direct examination by his attorney, Golenbock testified as follows:

"Q. You testified that you took control of corporate assets. Took control of some of the assets. What did you do?

"A. Well, as Dr. Fink mentioned, it was pretty muddy as to what was—in terms of cash, what was A&J and what was J&A and what was Fink & Golenbock, and on my own I did some things to simplify that. I took the money and put them into bank accounts so I could deal with that money.

"Q. And did you—and approximately how much money was that?

"A. I believe it to be about $120,000.

"Q. That's in terms of cash that we're talking about?

"A. Yes.

"Q. And what entities' cash did that consist of?

"A. That was from A&J, J&A, and Stony—sorry—from Fink & Golenbock, P.C.

"Q. And, Dr. Golenbock, what happened to the cash?

"A. I invested it in various investments. . . .

"Q. What happened to the money, Dr. Golenbock?

"A. The money—the money disappeared in those—in those investments. Whatever I put the money in, I lost the money."

On cross-examination by the plaintiff's attorney, Golenbock further testified:

"Q. All right. Now, some of the money that you took out of Fink-Golenbock, as you already testified about, without Dr. Fink's knowledge or permission, did you invest some of that money in South African gold options?

"A. There were some mineral—and I think they were options—from South Africa.

"Q. And did you consider that to be a very conservative investment?

"A. No.

"Q. Would you say it was very speculative, sir?

"A. Yes."

Given the testimony of both the plaintiff and Golenbock, the jury could reasonably have found that by preventing the plaintiff from participating in the corporation's medical practice, by using the corporation's funds for personal speculative investments, and by taking over the corporation's client base, equipment and assets in order to establish a new corporation with Magner, Golenbock had engaged in conduct that made him individually liable for conversion, unjust enrichment, tortious interference with the corporation's reasonable business expectancies and breach of his fiduciary duty as a director of the corporation. The fact that there was conflicting testimony does not equate to insufficient evidence. "If there is conflicting evidence . . . the fact finder is free to determine which version of the event in question it finds most credible." *State* v. *Bruno*, 236 Conn. 514, 546, 673 A.2d 1117 (1996). The trial court, therefore, properly denied Golenbock's motions for directed verdict and judgment notwithstanding the verdict.

C

Golenbock's third claim on appeal is that the trial court improperly admitted into evidence, as a full exhibit, the written report of the plaintiff's expert witness, Michael Purcell. Without deciding whether the report or the statements contained within the report fit within any of the traditional exceptions to the hearsay rule; see, e.g., General Statutes § 52-180 (admissibility of business entries and photographic copies); we conclude that the admission of the report, even if improper, was harmless.

Purcell, a certified public accountant, had been hired by the plaintiff to evaluate the corporation's probable worth as of October, 1987, and to estimate its probable worth in 1990. He reviewed the corporation's 1986 income tax return and its January, 1987 financial state-

ment and interviewed the plaintiff and the accountant for the corporation. At trial, Purcell testified to his findings and offered an opinion as to the corporation's probable worth as of 1987.[27] He was subject to cross-examination regarding his method of evaluation.

In addition to Purcell's testimony, the trial court allowed the plaintiff, over objection, to offer into evidence as a full exhibit, the report Purcell had prepared as part of his assignment, which contained the same information as his trial testimony.

Because the evidence contained in the report was merely cumulative, its admission as a full exhibit was harmless. "It is well recognized that any error in the admission of evidence does not require reversal of the resulting judgment if the improperly admitted evidence is merely cumulative of other validly admitted testimony. *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W.*, 190 Conn. 371, 391, 461 A.2d 422 (1983). Even if we were to presume that the [trial court improperly admitted the report] . . . the [defendant] would need to prove that that [report] more probably than not affected the result. *State* v. *Payne*, 219 Conn. 93, 102–103, 591 A.2d 1246 (1991)." (Citation omitted.) *Ann Howard's Apricots Restaurant, Inc.* v. *Commission on Human Rights & Opportunities*, 237 Conn. 209, 223, 676 A.2d 844 (1996). We conclude that, because the report was merely cumulative of Purcell's testimony, and because Golenbock offered no proof that the result would have been different had the report not been admitted, its admission, even if improper, was harmless.

## D

Golenbock's final claim on appeal is that the trial court improperly ruled in favor of the plaintiff on his

[27] That part of the report estimating the corporation's probable worth in 1990 was redacted prior to the report's admission as a full exhibit.

CUTPA claim. Golenbock argues that, as a matter of law, CUTPA does not apply under the facts of this case, because any wrongdoing was on an intracorporate level and did not implicate trade or commerce. We disagree.

In support of his claim, Golenbock cites two Superior Court decisions involving shareholders who have claimed CUTPA violations in response to actions by corporate directors that had a negative impact on stock value.[28] In those cases, the court dismissed the CUTPA claims because the claimed injuries had been the result of intracorporate actions. Without deciding whether those claims were properly dismissed, we find that those cases are inapposite to the present case. In this case, the defendant took certain actions designed to usurp the business and clientele of one corporation in favor of another. As such, Golenbock's acts fit squarely within the provenance of CUTPA.

CUTPA provides a private cause of action to "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . ." General Statutes § 42-110g (a). A "person" is defined as, "a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity . . . ." General Statutes § 42-110a (3). "CUTPA, by its own terms, applies to a broad spectrum of commercial activity. The operative provision of the act, [General Statutes] § 42-110b (a), states merely that '[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.' Trade or commerce, in turn, is broadly defined as 'the advertising, the sale or rent or lease, the offering for sale or

---

[28] See *Gilman* v. *Gilman*, Superior Court, judicial district of New London, Docket No. 508736 (August 29, 1990); *Dunbar* v. *S.O.M.B., Inc.*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 328725 (August 6, 1987).

rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.' General Statutes § 42-110a (4). The entire act is remedial in character; General Statutes § 42-110b (d); *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 615 n.4, 440 A.2d 810 (1981); and must 'be liberally construed in favor of those whom the legislature intended to benefit.' . . . *Concept Associates, Ltd.* v. *Board of Tax Review*, 229 Conn. 618, 623, 642 A.2d 1186 (1994)." *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 492, 656 A.2d 1009 (1995). We conclude that the provision of medical services falls within CUTPA's definition of trade or commerce as "the distribution of any services . . . ." General Statutes § 42-110a (4).

Golenbock asks us to focus solely on the relationship between the individual, as opposed to corporate, parties to determine whether CUTPA should apply. Characterizing the action as a dispute over the internal governance of the corporation, he argues that CUTPA does not extend to cover his actions. We disagree. Golenbock's actions went well beyond governance of the corporation, and placed him in direct competition with the interests of the corporation.

In *Larsen Chelsey Realty Co.* v. *Larsen*, supra, 232 Conn. 480, we recently were faced with similar issues. In that case, the defendant, who was president of Larsen Chelsey Realty Company (Larsen Chelsey), accepted employment with a competing firm. Id., 485. He sent notices to clients and business contacts, falsely informing them that Larsen Chelsey was being taken over by the competing firm and that they should take their business to that firm. Id. In addition, the defendant informed Larsen Chelsey brokers that they should seek employment with the competing firm. Id. The trial court in *Larsen* agreed with the defendant's argument that

CUTPA did not apply because the defendant's activities were within the confines of his employment at Larsen Chelsey, and CUTPA did not apply to that employer-employee relationship. Cf. *Quimby* v. *Kimberly Clark Corp.*, 28 Conn. App. 660, 613 A.2d 838 (1992) (defendant employer's failure to pay benefits in timely manner does not implicate trade or commerce).

On appeal to this court, we held that it was not the employment relationship that was dispositive, but the defendant's conduct. *Larsen Chelsey Realty Co.* v. *Larsen*, supra, 232 Conn. 492. We concluded that by falsely informing clients and business contacts that Larsen Chelsey was going out of business, by taking that client base to a competitor and by taking Larsen Chelsey employees to a competitor, the defendant had engaged in unfair trade practices in violation of CUTPA. Id., 494.

Much like the defendant in *Larsen*, evidence was adduced to establish that Golenbock took steps to ensure that the plaintiff and the corporation would have no opportunity to engage in the practice of medicine in Bethel. Using threats, Golenbock forced the plaintiff first to leave the practice and then to leave town. Golenbock informed clients that the corporation had changed and that they should take their business and pay their bills to a new corporation. Golenbock took over the corporation's assets, equipment and employees, using them to establish his new practice, which provided the same type of services. Because the original corporation had neither been dissolved; see footnote 19; nor extinguished; see footnote 20; these acts amounted to competitive moves designed to co-opt all of the corporation's operations.

Golenbock further claims that CUTPA should not apply because his wrongful acts did not cause substantial injury to consumers. Injury to consumers, however,

is merely one criterion for determining whether a practice violates CUTPA. "It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the 'cigarette rule' by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Citations omitted; internal quotation marks omitted.) *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 105–106, 612 A.2d 1130 (1992).

"We previously have stated in no uncertain terms that CUTPA imposes no requirement of a consumer relationship. In *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, 192 Conn. 558, 473 A.2d 1185 (1984), we concluded that 'CUTPA is not limited to conduct involving consumer injury' and that 'a competitor or other business person can maintain a CUTPA cause of action without showing consumer injury.' Id., 566, 567." *Larsen Chelsey Realty Co.* v. *Larsen*, supra, 232 Conn. 496. Accordingly, we conclude that Golenbock's actions fell within the purview of CUTPA.

The judgment as to Magner is reversed and the case is remanded with direction to render judgment in favor of Magner; the judgment as to Golenbock is affirmed.

In this opinion the other justices concurred.