[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM FILED APRIL 24, 1997
The defendant moves to dismiss the action for visitation brought pursuant to General Statutes § 46b-59 by the plaintiff, Nicos Paraskevas, concerning the minor child of the defendant, born by artificial insemination during the time the parties to this action cohabited. The plaintiff is not the biological father, nor did he adopt the child, nor was he ever married to the child's biological mother. He earlier sought relief of the court by filing an action pursuant to General Statutes § 52-466. That action was dismissed by the court,Harrigan, J., on September 18, 1995. The defendant claims that the plaintiff is barred from relief on the grounds of either collateral estoppel or res judicata, because the decision by the court, Harrigan, J., on September 18, 1995, was never appealed, and is the law of the case. Additionally, the defendant seeks to dismiss this statutory action predicated on the Supreme Court's ruling in Castagno v. Wholean, 239 Conn. 336 (1996).
The plaintiff argues that this case is factually distinguishable from Castagno and that the court's holding, requires a threshold requirement that there must be a disruption or split of the family before an action will lie. The plaintiff CT Page 2458 argues that such a disruption is present in the case presently before this court.
Counsel for the minor child takes the position that the defendant has standing under Castagno and thus this court has subject matter jurisdiction to decide whether the plaintiff should be granted visitation.
The court held an evidentiary hearing that lasted two days to determine whether the plaintiff has standing to bring the present action. The court relies on the testimony it heard for the following factual recitation.
The child's primary teacher testified that the child was not abused or neglected in the sense which would implicate state action pursuant to Castagno, supra.
The defendant was called by the plaintiff. She testified that her relationship with the plaintiff commenced in 1978 and continued until 1994. Ms. Tunick also testified that she continued to see the plaintiff, against her wishes, until she sought and obtained a restraining order in August of 1995, prohibiting the plaintiff from any contact with her or the minor child. She indicated that she was aware early in the relationship with the plaintiff that he was incapable of inseminating her. She testified that she went to the doctor with the plaintiff to consult with respect to his medical issues surrounding procreation. She complained that the relationship was on-again, off-again, and that she removed herself from their home at one point for a period of five months.
They traveled to Cyprus twice, but she denied ever discussing the prospect of adopting a child there, or that they ever discussed adopting a child generally. She testified that her decision to be inseminated was her own, and the plaintiff laughed at her and said he did not care. He did attend one of the doctor's appointments when insemination was attempted, and was physically present at the hospital when the child was born. However, he did not attend the birth. In January of 1991 when the child was ill, Mr. Paraskevas drove the defendant and the child from Stamford Hospital to Boston Children's Hospital. The child was nine months old. The plaintiff visited often, but Ms. Tunick was at the child's bedside constantly.
Ms. Tunick returned with the child to the parties home in CT Page 2459 Stamford, where they lived until her decision to leave in February of 1994. On cross-examination, she testified as to a normal week. She would wake with the child, who continued his stomach problems which had caused his January 1991 hospitalization. The plaintiff left for work by 8 a.m. He arose, got dressed. and left. He did not eat breakfast with them, but she was expected to make the coffee. He would come home late at night, around 10 or 11 p.m. She frequently would be with the child, who had "tough" nights, when the plaintiff returned home.
According to Ms. Tunick, they did not go out on Saturday, however, the plaintiff did. They would do what the plaintiff wanted to do on Sundays, and they often went out together. The defendant claimed that the plaintiff ran her life. There was an issue concerning her being Jewish.
Ms. Tunick claimed that her parents supported the child and her, but that the plaintiff paid the mortgage, taxes, and homeowners' insurance on their jointly-held home. She conceded that he had purchased formula for the child on occasion, but so had her family. She testified that he purchased his own food, and paid his own expenses of life, but that she paid all of the medical expenses of her insemination, carrying the child, the birth of the child, and all medical expenses for the child since the date of the child's birth. The baby nurse and the cost of education have been born exclusively by the defendant.
Since the separation, the plaintiff gave two gifts to the child. One was a Sunoco basketball from the plaintiff's gas station, and the second was the Christmas of 1996. Both gifts were returned with a request that no further contact be attempted. On redirect, the defendant admitted that she had accompanied the plaintiff when he purchased bunk beds for David for his use at the defendant's new home. She also admitted that while the plaintiff had been visiting prior to the restraining order issued in August of 1995, that the plaintiff had purchased toys for the child, and participated in activities with him.
The child has had two therapists, the first of which was retained when the child was two, and the second a year prior to the move from the home in Stamford. The first therapist dealt with issues concerning the child's illness. The mother testified that the plaintiff had never inquired into the well being of the child with the therapist, or the child's school, or their rabbi. CT Page 2460
The plaintiff called the defendant's former friend, Deborah "Lauray" Gabbai, a clinical social worker,[1] who has known Ms. Tunick since junior high school, approximately 30 years. While she had hoped to be Ms. Tunick's birth coach, another friend was asked. They did, however, continue to speak daily, and visit. Ms. Gabbai observed the parties and David together and was aware of their habits. She referred to them as a "family." She testified that the child did not exhibit fear of the plaintiff, and that the child often held the hands of both his mother and the plaintiff simultaneously. Ms. Gabbai never felt the need to report to the Department of Children and Families any conduct which was injurious to this child.
The witness testified that the defendant had refused to allow the child to use the plaintiff's name as a surname. She also testified that the defendant discussed with her that the plaintiff have no legal rights to the child. The witness testified that she recommended to the defendant that the plaintiff have no legal rights as to the child. On examination of the witness by counsel for the minor child, she revealed that she and the defendant discussed limiting the contact between the child and the plaintiff because of how unhappy their relationship was, and she indicated that Ms. Tunick gave some consideration to not returning to the parties' residence after the birth of the child.
The defendant had told the witness that she intended to seek a Jewish donor for the child but with brown hair and eyes because of the plaintiff's coloring. The defendant also told the witness that she was happy when she no longer had to spend Sundays with the plaintiff. Ms. Gabbai testified that she did not think she was being supportive of a traditional family unit, but that she was being supportive of the family unit which David would enter. She trusted the defendant to do what was fight, regardless of whether or not the plaintiff had a legal claim for visitation with the child.
At the time of these conversations, the witness was aware of the allegations of abuse the defendant had made vis a vis the conduct of the plaintiff. She agreed that the restraining order was appropriate, and that she also feared the plaintiff's temper. She recalled an incident where she was out with Ms. Tunick and their car broke down. They called the plaintiff to help them and when he showed up, he was very angry. Ms. Gabbai stated she was afraid and would never forget the incident but also stated that CT Page 2461 she has a fear of anger generally. When asked why she supported the defendant's request for General Statutes § 46b-15 relief from abuse, she replied that she believed the concerns expressed by the defendant concerning her request for her interest in the residence would anger the plaintiff. She was not aware of any pending litigation concerning the real property, but that Ms. Tunick had asked for the return of the clothing she had left at the property, and that when she went to retrieve those items, she learned that the plaintiff had given them to Good Will. She knew about the messages on Ms. Tunick's answering machine.[2] Ms. Gabbai considered it possible that the plaintiff could be violent with the defendant.
The plaintiff later admitted to the witness that he had an affair during his relationship with the defendant. The disclosure was not made in any context, nor did it seem to implicate an effect on this matter.
On cross-examination, Ms. Gabbai agreed that she admired many things about her friend, the defendant, among them her gentleness and her kindness. She agreed further that the defendant would never knowingly do anything against her child's best interest. She had earlier testified that she did not feel that the plaintiff's reputation in the community was as sound. She referred to him as "unscrupulous" in his business dealings. When asked to expand on that point, Ms. Gabbai said she thought the plaintiff was a good mechanic but that he would cut corners.
Ms. Gabbai agreed that the relationship between the parties was hostile and "fraught with problems. She believed that the child had already suffered as a result of the dysfunction of their relationship. She testified that she believed that the defendant was honest in her belief that the child had no ties to the plaintiff. She said that at the time of her deposition the child had not had contact with the plaintiff for several months. She further testified on redirect that regardless of the sincere belief of the defendant, she had observed the child with the plaintiff, had heard him refer to the plaintiff as "daddy," and had observed their close ties during visits after the parties' separation.
The witness further agreed during cross-examination that she had expressed a concern about her own child playing with David, and she testified that the horseplay between the plaintiff and the child was normal for them, as depicted in the Christmas 24, CT Page 2462 1994 video tape played for the court.
The witness testified that the parties had discussed adoption and that the defendant told the witness that the plaintiff felt it would feel more like his child if he saw her pregnant. She had been told by the defendant that the plaintiff had taken her to the doctor when she was inseminated.
The plaintiff called Seymour Fury, the father of Ms. Gabbai, who has known the defendant for approximately thirty years. He referred to the many holidays that the parties spent with his family, and considered the plaintiff to be "devoted" to the child. He did not see any concern or fear on the part of the child in his interaction with Mr. Paraskevas, but rather saw active play between them, that often caused concern for the defendant. He testified that the plaintiff was the only man in the child's life. The last time he observed the three together was in July of 1995, when his daughter had a tag sale. Neither the defendant nor the child appeared to be in fear.
The witness testified that he had heard the testimony of his daughter, Ms. Gabbai, when she described the relationship between the plaintiff and the defendant as horrible. He stated that he was not in the position to be informed concerning their relationship.
He recognized the defendant's brother who accompanied her to court, and recited the scope of male relatives and agreed that they were a close family.
The plaintiff testified that he had proposed marriage to the defendant, because he very much wanted the child to have his name. She replied that maybe they would do it.
The plaintiff testified that he met the defendant when he moved to the United States in 1978, when he worked in his brother's clothing store, and the defendant worked nearby. She moved into his apartment shortly thereafter while she pursued a divorce from her then husband. Thereafter, he began Nicos' Foreign Car Repair, and now owns his own gas station at High Ridge Road in Stamford. That business was purchased in 1983 or 1984.
The parties purchased a home on Long Ridge Road in Stamford, and that home is owned jointly by the parties and is the subject CT Page 2463 of a partition action which is consolidated with this action for visitation. The plaintiff testified that he put one hundred and sixty thousand dollars ($160,000) into the home, and the defendant invested forty thousand dollars ($40,000), which was contributed by her father. On cross examination, the question of who contributed how much to the jointly owned home was disputed and left open ended. The plaintiff testified that he paid the mortgage, taxes, insurance, landscaping and that the defendant was in charge of fixing the home and furnishing it.
Prior to the birth of the child, the parties celebrated holidays with the defendant's family. They celebrated both Christian and Jewish holidays, according to the testimony. Easter was in their home, which was celebrated with members of plaintiff's family who lived in the United States. Their Easter was celebrated by the grilling of a whole lamb, which he would go to Astoria, Queens, New York, to purchase. He said that the holiday lasted a couple of days. The high holy days were celebrated with the defendant's family, including attendance at synagogue. David accompanied them after his birth.
The plaintiff claimed that the parties discussed adoption, and thought of adopting a child from Cyprus. He claimed that he discussed that with his mother. He claimed that he and the defendant discussed artificial insemination utilizing a donor who was dark-skinned and intelligent. He claimed that they discussed using his older brother's sperm, but that he felt uncomfortable with that. He claimed that he met the doctor, but he did not accompany Ms. Tunick into the room where she was inseminated. He did recall how he helped her with follow-up care, but also believed that she was only inseminated once.
The plaintiff said that the defendant suffered complications from the pregnancy, and that she had early contractions, and was sent to bed. She was hospitalized three days prior to the delivery. He had been with her in the hospital, went to work, and an employee told him that he had been summoned for the delivery. He waited, after the nurse told him that the defendant did not want him in the room. He constructed a banner saying "It's a boy" at the gas station, and hung it there. The plaintiff drove the defendant and the baby home from the hospital.
The maternal grandmother hired a registered baby nurse to assist them in the handling of the new infant. He stated that Ms. Tunick's delivery was very difficult and she needed help. He CT Page 2464 described the virus which the child contracted at nine months of age. He drove the baby and the defendant, with her sister, to Boston Children's Hospital, where the child stayed for three to four weeks. He returned them home after the hospital stay. The plaintiff knew the formula name for the prescribed formula which helped the child. He was billed monthly for that formula, that was delivered to his gas station, and brought home by him. After being hospitalized, the child slept between the parties, and awoke many times with stomach pain in the night, and the parties would walk him to soothe him. The child continued to sleep in their bed until the defendant moved out of the parties' home on Long Ridge Road when the child was just a few months shy of his fourth birthday.
After the defendant relocated, the plaintiff would leave home, stop at a deli, get coffee and sometimes a grilled cheese sandwich for David, and go to the defendant's home for breakfast. They had a password "zaggapoli" which in Greek means I love you very much. He did, during the first couple of weeks, spend nights at her home, again with David sleeping in the middle. The defendant ultimately requested that he stop staying there overnight, and he did.
During the first four years of David's life, the plaintiff asserted that he paid all of the bills of their household. He testified that he even paid for the telephone in the defendant's Range Rover and contributed $14,000 to the purchase of said vehicle. The families continued to share holidays, and exchanged "mountains of gifts." He testified that the defendant liked to buy and give gifts, and that that process involved all of the family members and especially the children in Ms. Tunick's family, who he named.
The plaintiff claimed that when the child was awake in the morning, he would give him breakfast, and sometimes bathe him. He returned from work at 9:30 p.m. or 10:00 p.m. On weekends, he worked on Saturdays until 6 p.m. and he would join the defendant and the child. On Sundays, he testified that the day was devoted to David. They spent time outside, in the woods, went to lunch, or to the Danbury Mall, where the child loved the merry-go-round. They also went to fairs. When the family went on these excursions, he claimed all purchases were made by him.
The plaintiff hosted David's first birthday party at the Hyatt in Greenwich, for sixty people. He was excited because it CT Page 2465 closely followed David's discharge from the hospital. The second birthday was celebrated at the maternal grandparents' home, again with family from both sides in attendance. The plaintiff testified that the defendant gave him Father's Day presents, the last being an expensive green jacket. The plaintiff testified that he purchased Mother's Day presents for David to give to his mother.
The plaintiff traveled to Cyprus when the child was six months old and one other time. The defendant asked for jewelry from a friend of the plaintiff's in Cyprus. There were special items which he purchased, at the defendant's request, which seemed to be designed for mother and son.
After the parties were separated, the defendant told the child that the plaintiff was not his father. The plaintiff testified that the child seemed confused, and Mr. Paraskevas told him that he was as much like a father as David would know, and that David was as much a son as he would know.
The plaintiff testified that he had a large insurance policy, and that the defendant was the beneficiary of all his benefits until very recently when he was married to another woman. In March of 1988, the plaintiff opened a bank account which had as survivor, the defendant. The account was closed in 1991, when the plaintiff needed the money in the account and withdrew it. (Pl. Exh. 7.)
The plaintiff testified that the defendant used his gas station for gasoline, without charge, until she had the restraining order served upon him.
The plaintiff recently became a United States citizen, and denied that he had ever threatened to take David to Cyprus to stay. He admitted that he told the child that they would visit his parents in Cyprus, along with his brother and his children.
The plaintiff agreed that he had not contacted the child's therapist, saying that he did not believe in counseling. He knew the reason for the initial consultation. He agreed that he had not contacted the school, but said that the defendant had insisted that he not contact the school, and that it made him very angry.
On cross-examination, the plaintiff was asked his CT Page 2466 recollection of certain key people in the life of the child, many of which he was unable to recall. He admitted that he did not recall proposing marriage to the defendant until two years after the birth of her child.
He admitted that he called her fat when they argued, and saying that she was mean. When asked concerning the calls to her answering machine, he agreed that he was angry and made the calls, although his recollection failed when asked if he said, as heard on the tape, that David was nothing to him, and had no father on the birth certificate. He agreed that the bank account with the defendant as trustee was really his money which was his to use as he pleased. (Pl. Exh. 7.)
The plaintiff admitted in his testimony that he had forged the defendant's name on a mortgage which encumbered the residence shared by the parties prior to their separation. The mortgage post-dated the defendant's removal of herself, her possessions, and the child, from that home. On redirect, the plaintiff testified that the mortgage was released.
The plaintiff admitted that he had signed a verified complaint in his petition for habeas corpus relief in August of 1995, which petition sought custody of the child.
The plaintiff testified that when he said "you get more flies with honey" on the answering machine tape he meant that kindness would more likely get a result, and that he did not mean it as a threat. He testified that he never went to Ms. Tunick's home in Greenwich without her permission. On cross-examination, he claimed that he did not call her to upset her. The testimony on this issue from the plaintiff was not very credible.
On rebuttal, the defendant testified that she agreed with the testimony of Ms. Gabbai, that her relationship was horrible, and she testified that it was a "nightmare." She testified that she returned to the home after the child's birth because she was afraid not to. She claimed that the plaintiff did not help her with the child, even when the child was in such great distress.
She denied that the plaintiff had ever spent an overnight with her after she had moved with the child to Greenwich. She claimed that she never invited him to visit. The testimony seems to conflict with the Christmas 1994 videotape, where the parties celebrated together and the photographs of the parties at Ms. CT Page 2467 Gabbai's tag sale one month prior to the restraining order. She testified that she did not want to see him, but that she was made to see him based upon his threats. She testified that she was afraid to get a restraining order. She agreed that she allowed him to take the child once by himself to the Stamford Nature Center, but denied they had gone to a restaurant in Queens together.
She agreed that she was friendly with a Mr. John Conti from the time the child was two and one-half, and during the time she moved from their jointly-owned residence. She also testified that after she moved from the Stamford home to Greenwich, she occasionally stayed overnight at Mr. Conti's and would sleep in the same bed with him with the child between them. According to Ms. Tunick's testimony the relationship was nothing more than a friendship.
 I. Res Judicata, Collateral Estoppel and Law of the Case
The defendant, at oral argument, raised and argued that the present action is barred by res judicata, collateral estoppel and the law of the case. Even though the defendant failed to brief these issues, the court will briefly address the argument. As stated in the facts, the plaintiff filed a writ of habeas corpus pursuant to General Statutes § 52-466. The court, Harrigan,J., dismissed the habeas action finding that Mr. Paraskevas was "not within the class of persons to whom the writ of habeas extends pursuant to 52-466.[3] (Transcript of proceedings before Judge Harrigan dated September 18, 1995 entitled "Court Orders," p. 1.)[4] The court also stated: "The petitioner has adequate remedy if he utilizes the 46b chapter visitation statute. You may obtain a hearing in that fashion, but not through the use of the habeas statute." Id.
A. Res Judicata
"[T]he doctrine of res judicata, or claim preclusion, [provides that] a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action on the same claim. A judgment is final not only as to every matter which was offered to sustain the claim, but also as to any other admissible matter which might have been offered for that purpose . . . The rule of claim preclusion prevents reassertion of the same claim regardless of what additional or different evidence or legal CT Page 2468 theories might be advanced in support of it. (Citations omitted; internal quotation marks omitted.)" Connecticut Natural GasCorporation v. Miller, 239 Conn. 313, 322 (1996), quotingDelahunty v. Massachusetts Mutual Life Ins. Co., 236 Conn. 582,589, 674 A.2d 1290 (1996).
The Supreme Court has recognized "that a decision whether to apply the doctrine of res judicata to claims that have not actually been litigated should be made based upon a consideration of the doctrine's underlying policies, namely, the interests of the defendant and of the courts in bringing litigation to a close . . . and the competing interest of the [defendants] in the vindication of a just claim . . . Put otherwise, the principle of res judicata is based on the public policy that a party should not be allowed to relitigate a matter which it already has had an opportunity to litigate." (Citations omitted; internal quotation marks omitted.) Connecticut Natural Gas Corporation v. Miller,supra, 239 Conn. 322-23.
The only claim before Judge Harrigan was a writ of habeas corpus pursuant to General Statutes § 52-466 which gives, inter alia, an adoptive or foster parent standing to bring an action for custody. A claim for visitation was not put forth nor could it be under the statute. This court agrees with Judge Harrigan's statement that a remedy was available to the plaintiff in the form of the action that is presently before this court pursuant to General Statutes § 46b-59 and finds that the judgment rendered in the habeas action does not have res judicata or claim preclusive effect on the present visitation claim.
B. Collateral Estoppel
"[C]ollateral estoppel, or issue preclusion, prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action . . . For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated . . . The doctrine of collateral estoppel is based on the public policy that a party should not be able to relitigate a matter which it already has had an opportunity to litigate . . . In discussing what constitutes `full and fair litigation' for the purposes of collateral estoppel, we have stated that if the nature of the hearing carries procedural limitations that would not be present at a later hearing, the party might not have a full and fair opportunity to litigate . . ." (Citations omitted; emphasis in original; CT Page 2469 internal quotation marks omitted.) Connecticut Natural GasCorporation v. Miller, supra, 239 Conn. 324.
In the present case, the issue of visitation was neither "fully and fairly litigated," nor was it "actually litigated and necessarily determined." Id. Further, the procedural limitations inherent in a § 52-466 proceeding denied the plaintiff an opportunity to litigate visitation in any respect. Accordingly, the court concludes that collateral estoppel, like its cousin[5] res judicata, cannot properly serve to bar the plaintiff from bringing the present action for visitation.
C. Law of the Case
"If the first decision was final, in the res judicata sense, it cannot be disregarded under the doctrine of the law of the case. If, however, the first decision was not final, but was merely interlocutory, it falls within the doctrine of the law of the case." CFM Of Connecticut, Inc. v. Chowdhury, 239 Conn. 375,403 (1996). In the present case, the decision of Judge Harrigan as to custody was final in the res judicata sense but that does not prevent the plaintiff from bringing the present action for visitation. The court finds that the doctrine of the law of the case is not applicable to this case, a completely separate and distinct action, and thus denies the motion to dismiss on this basis as well.
II. Standing
The defendant argues that the plaintiff lacks standing to seek visitation with the minor child pursuant to General Statutes § 46b-59.[6] The defendant relies upon the recent holding of the Supreme Court in Castagno v. Wholean, 239 Conn. 336
(1996).
"Standing focuses on whether a party is the proper party to request adjudication of the issues, rather than on the substantive rights of the aggrieved parties. (Internal quotation marks omitted.) Herzog Foundation, Inc. v. University ofBridgeport, 41 Conn. App. 790, 793, 677 A.2d 1378 (1996)." MacLeanv. Town of Darien, 43 Conn. App. 169, 176, 682 A.2d 1064 (1996). "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action . . . (Internal quotation marks CT Page 2470 omitted.) Ardmare Construction Co. v. Freedman, 191 Conn. 497,501, 467 A.2d 674 (1983). [O]nce the question of lack of [standing] is raised, [it] must be disposed of no matter in what form it is presented . . . [A] court must have jurisdiction to determine its own jurisdiction once that has been put in issue. [Internal quotation marks omitted.] Golden Hill Paugussett Tribeof Indians v. Southbury, 231 Conn. 563, 570-71, 651 A.2d 1246
(1995), quoting Castro v. Viera, 207 Conn. 420, 429-30,541 A.2d 1216 (1988)." Fink v. Golenbock, 238 Conn. 183, 199,680 A.2d 1243 (1996). Thus, even though Ms. Tunick did not raise the issue of the plaintiff's standing in a timely manner, the court is required to address it before proceeding further. Id. "The plaintiff has the burden of proving standing. Sadloski v.Manchester, 235 Conn. 637, 648-49, 668 A.2d 1314 (1995)." Fink v.Golenbock, supra, 238 Conn. 199.
In Castagno v. Wholean, supra, 239 Conn. 337, the sole issue was "whether, pursuant to General Statutes § 46b-59, the trial court had subject matter jurisdiction to entertain a petition by grandparents for visitation rights with their minor grandchildren when the grandchildren and their parents were not involved in any case or controversy currently before the court and there was no claim that the family unit was no longer intact." Id. The court concluded "that although § 46b-59
lacks specific language imposing any threshold requirement, established rules of statutory construction, the context of the statute and its legislative history support the incorporation of a requirement that plaintiff's must demonstrate disruption of the family sufficient to justify state intervention. In the absence of any attempt . . . to satisfy this threshold requirement, [the court] conclude[d] that the trial court lacked jurisdiction to decide the issue of visitation and, therefore, properly dismissed the plaintiff's action." Id. 337-38. Accordingly, the judgment of the trial court was affirmed. Id.
The Castagno court concluded "that the legislature intended § 46b-59 to afford the trial court jurisdiction to entertain a petition for visitation only when the minor child's family life has been disrupted in a manner analogous to the situations addressed by §§ 46b-56[7] and 46b-57.[8] At this time we need not state precisely which circumstances will suffice to invoke the trial court's jurisdiction under § 46b-59. Although the death of a parent or the de facto separation of the parents may allow an action, there may be other times when an action is also warranted, such as when there has been a good CT Page 2471 faith allegation by a third party of abuse or neglect." (Footnotes added.) Id., 352. The Supreme Court did not attempt to enumerate and specifically identify all the triggering events or circumstances that may justify state intervention. The Castagno
decision illustrates the Supreme Court's concern that state intervention in a parent's determination of how to rear a child, a constitutionally protected liberty interest, must be justified by a triggering event. This triggering or threshold event must be more than a claim that a third party's visitation is in the child's best interest.
The Supreme Court also recognized, albeit in dicta, that the contours of "`family' are so fluid as to create myriad factual circumstances" to which the statute may apply. Castagno v.Wholean, supra, 239 Conn. 352 n. 15. The definition of family has been, in other contexts, recognized as evolving and changing. As the court explained in Michaud v. Wawruck, 209 Conn. 407, 415,551 A.2d 783 (1988), "[t]raditional models of the nuclear family have come, in recent years, to be replaced by various configurations of parents, stepparents, adoptive parents and grandparents. We are not prepared to assume that the welfare of children is best served by a narrow definition of those whom we permit to manifest their deep concern for a child's growth and development." Id. "When a non-traditional relationship is dissolving, the child is as likely to become a victim of turmoil and adult hostility as is a child subject to the dissolution of a marriage." In Re Custody of H.S.H.-K, 533 N.W.2d 419, 421 (Wis. 1995), cert. denied 116 S.Ct. 475 (1995) (held that if a petitioner proves parent-like relationship and significant triggering event justifying state intervention in the relationship between parent and child, court may determine whether visitation is in child's best interest even where former lesbian partner did not meet requirements of visitation statute).
In Castagno v. Wholean, supra, 239 Conn. 336, the family at issue was a traditional intact nuclear family consisting of mother, father and children and the grandparents of the defendants' minor children were seeking visitation. Factually,Castagno is completely distinguishable from the case before this court. Instead, before this court, is a man who, in a legal sense, is a stranger to the child. Rather, he is an "interested" third party. "Section 46b-59 is a third-party visitation statute that can be invoked by persons who do not share a blood or legal relationship with a child." In re Jennifer P., 17 Conn. App. 427,429, 553 A.2d 196, cert. denied, 211 Conn. 801, 559 A.2d 1136
CT Page 2472 (1989). The plaintiff is not the child's biological father. He is not the child's adoptive father. He is not the child's stepfather nor is he the child's foster parent. Mr. Paraskevas never married the child's mother. The plaintiff is, however, a man who cohabitated with and cared for the child's mother and child for almost four years of the child's life. Cohabitation with the minor child's mother spanned almost seventeen years.
The language of Castagno cited above, i.e., that disruption of the child's family as a threshold requirement to bringing a visitation action includes a parent's death, the parents' de facto separation, or some similar circumstances, leads this court to find that the Supreme Court did not attempt to limit state intervention in all cases but instead refused to allow state intervention in "intact families." Furthermore, pursuant to General Statutes § 46b-15,[9] the defendant in this action sought and obtained a restraining order in August of 1995, prohibiting the plaintiff from any contact with her or the minor child. That restraining order is in effect to this day. This court is of the opinion that such action by the defendant constitutes invocation of state intervention in the form of a judicial order. Thus, the defendant's argument regarding state intervention, as based on Castagno, cannot prevail.
The defendant argues that the holding of Castagno v. Wholean,supra, 239 Conn. 336, was "that where an application is made for visitation pursuant to Section 46b-59, . . . the plaintiff must demonstrate in fact specific pleadings disruption of the family sufficient to justify state intervention." (Defendant's Memorandum in Support of Motion to Dismiss dated November 27, 1997.) The defendant relies on the following language fromCastagno v. Wholean, supra, 239 Conn. 342-3, in support of this argument: "All families may have, at one time or another, unhappy conflicts and disputes among adult relatives that might result in an absence of contact between those adults and their minor relatives — be they grandchildren, nieces or nephews, cousins, etc. — but longstanding tradition holds that, absent compellingcircumstances justifying some state intervention in the form of ajudicial order, the parents' decision, whether wise or not,prevails." (Emphasis added.) Id. The court agrees that a plaintiff seeking visitation must plead facts that demonstrate disruption of the family but disagrees with the defendant's contention that this was the "holding" of Castagno. In any case, the court finds that the plaintiff has pled facts sufficient to show disruption of the family. The complaint alleges that the CT Page 2473 plaintiff and defendant lived together without being married for approximately seventeen years and that the plaintiff provided a home and support for the minor child of the defendant who was born April 13, 1990 for approximately four years. (Complaint ¶¶ 1, 3, 4 and 6.) The complaint further alleges that both parties to this action shared parental responsibilities of the child during this four-year period and that the child developed a close, caring and loving relationship with the plaintiff. (Id.
¶ 7.) Additionally the complaint alleges that the parties separated on February 4, 1995, and that the plaintiff visited the child at the defendant's new home on an almost daily basis until August of 1995. (Id. ¶¶ 9 and 11.) On August 8, 1995, the defendant sought and obtained an ex parte restraining order prohibiting the plaintiff from any contact with the defendant or the minor child of the defendant. (Id. ¶ 14.) This restraining order is still in effect. (Id. ¶ 16.) It is the opinion of this court that the allegations of the complaint demonstrate, in a fact specific manner, the disruption of this nontraditional family.
At oral argument, counsel for the defendant presented the court with a South Dakota Supreme court case that is factually similar to the case presently before this court. In Cooper v.Merkel, 470 N.W.2d 253 (S.D. 1991), the defendant, sought visitation with the plaintiff's son after the plaintiff sought and obtained a restraining order restraining the defendant from committing any acts of domestic abuse against the plaintiff. Id., 254. In Cooper v. Merkel, supra, as in the case before this court, the person seeking visitation was a "nonparent." Id. The trial court held that "at common law a nonparent had no legal right to visitation with a minor child and in the absence of any statute, it lacked authority to, order nonparent visitation." Id.
The Supreme Court of South Dakota upheld the trial court's decision dismissing the defendant's motion for visitation. Id., 256. The defendant argues that this court should follow Cooper
and find that a parent's right to custody should only be disturbed in favor of a nonparent in cases of "gross misconduct or unfitness, or [i]f other extraordinary circumstances affecting the welfare of the child" is clearly shown. Id., 255. The defendant argues that the gross misconduct, unfitness or other extraordinary circumstances are the types of "compelling circumstances" that must be present under Castagno.[10] The defendant argued that allowing an ex-boyfriend, such as the plaintiff, to have standing will open the floodgates the Castagno
court attempted to shut. CT Page 2474
First, the court notes that the South Dakota statute at issue did not expand visitation rights "other than to extend such rights to grandparents if in the best interest of the child. SDCL 25-4-52." Cooper v. Merkel, supra, 470 N.W.2d 255 n. 2. Second, the Castagno court did not specifically define what it meant by "compelling circumstances" but the entire discussion of the Supreme Court indicates to this court that what is meant by "compelling circumstances" is disruption of the family unit or possibly neglect or abuse situations. In terms of the disruption of the family unit threshold requirement as set forth inCastagno, supra, this court is confronted with a situation where the parties never legally sanctioned their relationship. As discussed above, however, this does not mean that they were not a "family" and that the defendant's move from the home was any less a de facto separation than it would have been had the parties been married. The plaintiff had a long time relationship with the defendant (17 years). He gave the minor child emotional and financial support during the three years and ten months that they all lived together and visited the child on an almost daily basis for over one year following his separation from the defendant. From the testimony and evidence, the court further finds that the minor child often referred to Mr. Paraskevas as "daddy" until he was instructed by his mother not to do so. Accordingly, in light of the evidence and this court's conclusion that this case is in keeping with the requirements set forth in Castagno v. Wholean,supra, 239 Conn. 336 (1996), the court further concludes that the plaintiff has standing.
In summary, although this court recognizes and is bound by the Supreme Court's decision to limit the circumstances under which the jurisdiction of the court may be invoked under General Statutes § 46b-59, it finds that the Castagno case does not apply to the facts presently before it. Unlike Castagno, this court is faced with a "nontraditional" family which has separated. Applying the holding of Castagno to the facts, the court finds that the parties before it constituted a "nontraditional" family and the separation of the parties is tantamount to a "de facto" separation. Additionally, the obtaining of the restraining order has already invoked the power of the court to intercede in this family and cannot now be said to be meaningless when it comes to invoking the power of the state. Thus, even under Castagno, the plaintiff has standing. For the foregoing reasons the motion to dismiss is denied. CT Page 2475
Drancinis, J.