# CHARLES HART ET AL. *v.* THERESA CARRUTHERS
## (AC 22825)

Lavery, C. J., and Schaller and Bishop, Js.

Argued March 28—officially released June 24, 2003

*Barry T. Pontolillo*, for the appellant (defendant).

*Max F. Brunswick*, for the appellees (plaintiffs).

*Opinion*

LAVERY, C. J. The defendant landlord, Theresa Carruthers, appeals from the judgment of the trial court rendered in part in favor of the plaintiff tenants, Charles Hart and Annette Housley Hart (Annette Hart). On appeal, the defendant claims that the court improperly (1) determined that the agreement between the parties violated the terms of the rental assistance program, (2) concluded that the defendant violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and (3) violated the parties' constitutional rights by impairing their contractual obligations. We affirm the judgment of the trial court.

The following facts are relevant to our disposition of the defendant's appeal. On December 1, 1993, the plaintiffs, as tenants, entered into a written lease with the defendant for a dwelling at 39 Blakeslee Avenue in North Haven. The term of the lease was one year, and, after its expiration, the plaintiffs remained on the premises, on a month-to-month basis, through December, 1998. The plaintiffs qualified for the state department of housing's rental assistance program. Pursuant to that program, the Community Action Agency of New Haven, Inc., as designated agent for the state department of housing, paid a portion of the plaintiffs' rent. Also pursuant to that program, the defendant entered into a state department of housing rental assistance contract (rental assistance contract), the purpose of which was to assist the plaintiffs to lease a dwelling unit from the defendant, and the parties entered into a state depart-

ment of housing rental assistance program lease (rental assistance lease).

In 1999, the plaintiffs brought the present action, claiming, inter alia, that by charging the plaintiffs $200 more per month in rent than was permitted by the terms of the rental assistance contract, the defendant breached her contract with the plaintiffs and the rental assistance program.[1] Specifically, the plaintiffs alleged that under the rental assistance contract, the defendant agreed that the rent for the premises would be $700 per month and that she would not charge more than that amount, but that she breached that contract by charging $900 per month in rent. The plaintiffs also alleged that the defendant's conduct of charging $900 per month rent, when she had agreed not to charge more than $700, constituted a violation of CUTPA.

After a trial to the court, judgment was rendered in favor of the plaintiffs on their claims that the defendant had breached the rental assistance contract and that the defendant's actions constituted an unfair trade practice in violation of CUTPA.[2] This appeal followed. Additional facts will be set forth as necessary.

We first set forth our standard of review. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To

---

[1] We note that although the plaintiffs were not a party to the rental assistance contract, it appears that they proceeded under a third party beneficiary theory. The rental assistance contract plainly states that its purpose is "to assist the Family identified in Section 1A to lease a decent, safe, and sanitary dwelling unit from the Owner." Section 1A lists Annette Hart as the family representative.

[2] The court awarded $12,000 in damages to the plaintiffs on their breach of contract claim and $1 to the plaintiffs on their CUTPA claim. The court further found in favor of the defendant on her counterclaims for unpaid rent and damages to the premises. The court awarded the defendant $2984.60 on her counterclaims and offset that amount against the $12,001 judgment for the plaintiffs. No appeal was taken from the judgment on the defendant's counterclaims.

the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Verna* v. *Commissioner of Revenue Services*, 261 Conn. 102, 107, 801 A.2d 769 (2002).

I

The defendant first claims that the court improperly determined that the agreement between the parties violated the terms of the rental assistance program by prohibiting the parties from entering into a separate agreement for the rental of a garage. The defendant asserts that the parties had agreed that the rent for the dwelling unit at 39 Blakeslee Avenue would be $700 per month, but that they had entered into a separate agreement for the rental of a garage on the same premises for $200 per month, which brought the plaintiffs' total monthly rent to $900. She argues that the rental assistance program provided rental assistance to the plaintiffs for the dwelling unit only and that the parties were free to contract for other services, such as the rental of the garage, which were not covered by the rental assistance program.

We begin our analysis by noting that the defendant has presumed incorrectly that the court determined, as a matter of law, that the rental assistance contract prohibited the parties from entering into a separate agreement for the rental of the garage.

The court, in its memorandum of decision, found the following: "When the parties entered into the state rental assistance contract, they agreed, in relevant part, to the following: 'The portion of the Contract Rent payable by the Family ("Family Contribution") will be an

amount determined by the Designated Agent in accordance with [state department of housing] regulations and requirements. This amount is *the maximum amount* the Owner can require the Family to pay for rent of the dwelling unit, including all services, maintenance and utilities to be provided by the Owner in accordance with the Lease.' . . . The defendant testified that the parties made a separate agreement concerning the attached, two car garage, which, she claims, was rented for an additional $200 per month. According to her testimony, since the garage was not part of the 'dwelling unit,' the administrators of the [rental assistance] lease were not concerned about how much the plaintiffs were required to pay. The plaintiffs, however, testified that the agreement was divided into a house-garage only to allow the defendant to collect an additional $200 that would otherwise be disallowed by the terms of the [rental assistance] contract. They further testified that they had very little use for the garage space since their family vehicle, a converted school bus, was too large to fit in the garage.

"*The court does not accept the defendant's explanation for the additional payment and finds that it was an attempt by her to circumvent the terms of the [rental assistance program] agreement.* Accordingly, the court finds for the plaintiffs and awards them $12,000 on count one of their complaint.

"The court further finds that *the defendant's actions—demanding and accepting an additional $200 per month from the plaintiffs in violation of the terms of the [rental assistance] contract*—constitute an unfair trade practice in violation of . . . General Statutes § 42-110b and awards the plaintiffs $1 in compensatory damages on count two." (Emphasis added.)

After reviewing the court's memorandum of decision, it is clear that the court did not determine that the

rental assistance contract prohibited the parties from entering into a separate agreement for the rental of the garage. Rather, the court simply did not believe the defendant's version of events and found that there was no actual agreement for the rental of a garage and that, in fact, the defendant's explanation of the $200 discrepancy between what the rental assistance program permitted her to collect and what she actually collected was merely a pretext to justify her having collected more in rent than was permitted under the rental assistance program.

Because the court made its determination on a factual basis, we must determine whether the court's determination that the defendant demanded and accepted $200 more per month than was permitted under the terms of the rental assistance contract was clearly erroneous. We conclude that it was not.

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Gordon* v. *Tobias*, 262 Conn. 844, 849, 817 A.2d 683 (2003).

After reviewing the record before the court, we are persuaded that the court's finding was not clearly erroneous. It is clear that there is evidence in the record supporting the court's determination that the defendant demanded and accepted $200 more per month in rent than was permitted by the terms of the rental assistance contract.

During the trial, the plaintiffs both testified that at the time they moved into the house at 39 Blakeslee Avenue, the only lease they had signed was the rental

assistance lease, which listed the rent as being $700. They testified that the month after they had moved in, the defendant came to their house with a new lease, which listed a rent of $900, and told them that if they wanted to stay in the house, they would have to sign the new lease.[3] Annette Hart testified that she signed

---

[3] During the trial, the following colloquy, in relevant part, took place between the plaintiffs' counsel and Annette Hart:

"[Plaintiffs' Counsel]: When you moved in, had you signed any leases?

"[The Witness]: When I moved? With [the rental assistance program].

"[Plaintiffs' Counsel]: Just with [the rental assistance program]?

"[The Witness]: That's correct.

\* \* \*

"[Plaintiffs' Counsel]: And under that lease, your rent was to be $700 a month; is that correct?

"[The Witness]: That's correct.

\* \* \*

"[Plaintiffs' Counsel]: Now, did there come a time when you were presented with another lease by [the defendant]?

"[The Witness]: Yes. After we moved in.

"[Plaintiffs' Counsel]: After you moved in?

"[The Witness]: After we moved in, then she brought her own lease.

\* \* \*

"[Plaintiffs' Counsel]: Now, Mrs. Hart, when did [the defendant] present you with the new lease for the $900 a month lease, exhibit E?

"[The Witness]: In December.

"[Plaintiffs' Counsel]: Okay. And what did she say to you when she presented it to you?

"[The Witness]: She said, in order for you to remain here, you will have to sign this agreement, which I made up. This was different than the rental agreement, rental assistance agreement, that we had signed with [the rental assistance program]. But I had already given up my dwelling, my family and I, and so I signed it, not having anyplace else to go.

"[Plaintiffs' Counsel]: Did she tell you why she was doing that?

"[The Witness]: She said she wanted more money for the dwelling."

The following colloquy took place between the plaintiffs' counsel and Charles Hart:

"[Plaintiffs' Counsel]: Now, were you present when . . . the defendant brought the $900 a month lease to the house?

"[The Witness]: Yes, I [was]. It was right in our kitchen.

"[Plaintiffs' Counsel]: What did you hear [the defendant] say?

"[The Witness]: She said, if you want to live there, or, you know, we had to sign the agreement with the—[the rental assistance program], first of all, for $700 for the place, and after, she came a month later with [the $900 lease]. I think it was December she came with [the $900 lease] and said

the new lease because she already had given up her previous home and had nowhere else to go. She and Charles Hart both testified that the defendant kept several items in the garage. There also was testimony, by Charles Hart, that the defendant never said anything about any additional rent for the garage.

Although the defendant may have claimed that there was an agreement between the parties whereby the plaintiffs paid the extra $200 as rental for the garage, her testimony and the evidence she submitted was in plain contradiction to the plaintiffs' testimony and evidence.[4] The fact that there was conflicting testimony does not equate to a conclusion that the court's finding was clearly erroneous. See *Fink* v. *Golenbock*, 238 Conn. 183, 210, 680 A.2d 1243 (1996). "The weight to be given to the evidence and to the credibility of witnesses is solely within the determination of the trier of fact." *State* v. *Campbell*, 61 Conn. App. 99, 102–103, 762 A.2d 12 (2000), cert. denied, 255 Conn. 934, 767 A.2d 105 (2001). "If there is conflicting evidence . . . the fact finder is free to determine which version of the event in question it finds most credible." (Internal quotation

. . . I'm going to have to go up on the rent in order for you to continue to—here. The property [is] worth more than $700."

[4] Included in the evidence the court may have considered, the record contains, in addition to two rental assistance leases and one rental assistance contract, three nonrental assistance leases signed by the parties. The plaintiffs submitted two of those leases, which are signed originals. The defendant submitted a photocopy of one lease. All three leases contain the parties' signatures. The three leases submitted by the parties appear to be identical, except for paragraph seven, which is entitled "RENT PAYMENTS." Under that paragraph, the original leases submitted by the plaintiffs, one of which ran from December 1, 1993, to November 30, 1994, and the other of which ran from December 1, 1994, to November 30, 1995, state that the plaintiffs will pay a monthly rent of $900. The lease submitted by the defendant, which ran from December 1, 1993, to November 30, 1994, lists the rent as being $700 and, on a separate line, states that the plaintiffs will pay $200 for rental of the garage. The signatures on all three leases are on the last page of the lease, whereas paragraph seven is on the first page of the lease.

marks omitted.) *Fink* v. *Golenbock*, supra, 210; see also *State* v. *Adams*, 225 Conn. 270, 278, 623 A.2d 42 (1993).

In the present case, there was evidence in the record supporting the plaintiffs' version of events, i.e., that the defendant charged them $200 more per month in rent than was permitted under the terms of the agreement with the rental assistance program and that there was no separate agreement for the rental of a garage. The court, as the trier of fact, found the plaintiffs' version of events credible, as it was permitted to do. "The court performed its duty, and we will not usurp its function." *State* v. *Campbell*, supra, 61 Conn. App. 103. We therefore conclude that the court's determination that the defendant collected $200 more in rent than was permitted under the terms of the rental assistance agreement was not clearly erroneous.

## II

The defendant next claims that the court improperly concluded that her actions constituted a violation of CUTPA because, to find that a CUTPA violation existed, the court had to have found that the "defendant has committed the alleged wrongful acts with such frequency as to indicate a general business practice." *Quimby* v. *Kimberly Clark Corp.*, 28 Conn. App. 660, 672, 613 A.2d 838 (1992). Specifically, the defendant argues, quoting *Quimby*, that her one transaction with the plaintiffs, or "singular failure to settle [the plaintiffs'] claim fairly"; id.; was not enough to constitute an unfair or deceptive trade practice in violation of CUTPA.[5] We disagree.

[5] The defendant cites to part II B of *Quimby* v. *Kimberly Clark Corp.*, supra, 28 Conn. App. 672, in support of her argument that she would have had to be engaging in similar types of unfair or deceptive practices with more individuals than just the plaintiffs for the court to have found properly that her actions constituted a CUTPA violation. The defendant's reliance on *Quimby* is misplaced because our holding in part II B of that opinion was based on our Supreme Court's decision in *Mead* v. *Burns*, 199 Conn. 651, 509 A.2d 11 (1986), and was limited to the specific situation in which a plaintiff has alleged violations of CUTPA and the Connecticut Unfair

This court recently addressed the issue of whether a defendant's "single act" of misconduct may constitute a violation of CUTPA. In *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, 72 Conn. App. 342, 344, 805 A.2d 735, cert. denied, 262 Conn. 922, 812 A.2d 864 (2002), the plaintiff subcontractor brought an action against the defendant general contractor, alleging that the defendant had violated CUTPA when it failed to award the plaintiff a subcontract for electrical work on a school project, despite the fact that the defendant, who had been required to "name" its subcontractors on the bid, had named the plaintiff as the subcontractor for the electrical work. Id. "The trial court held that, because the plaintiff did not prove that the defendant had engaged in a repeated course of misconduct, the plaintiff did not establish that the defendant violated CUTPA." Id., 349. This court reversed the judgment of the trial court and concluded that "the trial court improperly declined relief to the plaintiff on the ground that it had alleged and proven only a single act of misconduct." Id., 353. In so doing, we made it clear that a single act of misconduct may constitute a violation of CUTPA.

The defendant, therefore, is incorrect in claiming that a single transaction or act of misconduct cannot constitute a violation of CUTPA and that she would have had to be engaging in similar types of unfair or deceptive practices with more individuals than just the plaintiffs

Insurance Practices Act (CUIPA), General Statutes § 38a-815 et seq., *against an insurer* on the basis of *conduct that constitutes an unfair claim settlement practice* as defined in General Statutes § 38a-816 (6). Because the present case does not involve insurer misconduct or an alleged unfair settlement practice in violation of § 38a-816 (6), our holding in *Quimby* is not applicable. Moreover, to the extent that one might read *Quimby* to stand for the broad proposition that all CUTPA claims require more than a single transaction, we squarely reject that notion. See *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, 72 Conn. App. 342, 344, 805 A.2d 735, cert. denied, 262 Conn. 922, 812 A.2d 864 (2002).

for the court to find properly that her actions constituted a CUTPA violation. The defendant's claim, therefore, is without merit.

### III

The defendant's final claim is that the court "violate[d] the constitutional rights of the parties in ruling that the parties could not enter into other contracts for additional services which were outside the scope of the [rental assistance] contract." Specifically, the defendant asserts that the Connecticut legislature has not passed any law that would prohibit the parties from entering into a separate contract for the rental of the garage, but that the court "appears in its memorandum of decision to be utilizing both state regulations and [CUTPA] to void the garage rental contract between the parties." The defendant's claim is wholly without merit.

As we explained in part I, there is no evidence that the court held that the parties could not enter into a separate agreement for the rental of a garage. Instead, the court based its ruling on its finding that *there was no separate agreement* for the rental of the garage.[6] The court weighed the conflicting testimony and evidence and discounted the defendant's explanation for the additional rental payment, finding it an attempt by her to circumvent the terms of the rental assistance agreement.

The defendant, nevertheless, argues that "[t]he memorandum of decision . . . *intimates* that because the parties entered into a [rental assistance] contract for the dwelling unit, the parties could not enter into any other contracts for additional services" and that the

---

[6] In other words, the court believed the testimony of the plaintiffs and found that the defendant's explanation of the $200 discrepancy between what the rental assistance program permitted her to collect and what she actually collected merely was a pretext to justify her having collected more in rent than was permitted by the rental assistance program.

"trial court . . . *appears* . . . to be utilizing both state regulations and [CUTPA] to void the garage rental contract between the parties." (Emphasis added.) We do not understand the court's memorandum of decision to void a contract between the parties for the rental of a garage or to state that the parties were not permitted to contract for services outside of the rental of the dwelling unit. We also are not willing to read into the memorandum of decision something beyond that which is plainly stated.[7] We therefore conclude that the defendant's claim is entirely without merit.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[7] The court's memorandum of decision does not state that the parties were prohibited from entering into a separate contract for the rental of a garage, nor does it declare such an agreement void. If the defendant thought that the court, by its decision, was implying that the rental assistance contract prohibited the parties from entering into a separate agreement for the rental of the garage or that the court was impliedly declaring such an agreement void, the defendant should have filed a motion for articulation of the court's ruling. See *Thompson* v. *Orcutt*, 70 Conn. App. 427, 441, 800 A.2d 530, cert. denied, 261 Conn. 917, 806 A.2d 1058 (2002); *Maloney* v. *PCRE, LLC,* 68 Conn. App. 727, 743–44, 793 A.2d 1118 (2002).